538 U.S. 1 (2003)
 NATIONAL PARK HOSPITALITY ASSOCIATION, PETITIONER
v.
DEPARTMENT OF THE INTERIOR ET AL.
 No. 02-196.
 Supreme Court of United States.
 Argued March 4, 2003.
 Decided May 27, 2003.
 
 CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT.
 ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT.
 The Contract Disputes Act of 1978 (CDA) establishes rules governing disputes arising out of certain Government contracts. After Congress enacted the National Parks Omnibus Management Act of 1998, establishing a comprehensive concession management program for national parks, the National Park Service (NPS) issued implementing regulations including 36 CFR §51.3, which purports to render the CDA inapplicable to concession contracts. Petitioner concessioners' association challenged §51.3's validity. The District Court upheld the regulation, concluding that the CDA is ambiguous on whether it applies to concession contracts and finding NPS' interpretation reasonable under Chevron U. S. A. Inc. v. Natural Resources Defense Council, Inc., 467 U. S. 837. The District of Columbia Circuit affirmed, placing no reliance on Chevron, but finding NPS' reading of the CDA consistent with both the CDA and the 1998 Act.
 Held: The controversy is not yet ripe for judicial resolution. Determining whether administrative action is ripe requires evaluation of (1) the issues' fitness for judicial decision and (2) the hardship to the parties of withholding court consideration. Abbott Laboratories v. Gardner, 387 U. S. 136, 149. Regarding the hardship inquiry, the federal respondents concede that, because NPS has no delegated rulemaking authority under the CDA, §51.3 is not a legislative regulation with the force of law. And their assertion that §51.3 is an interpretative regulation advising the public of the agency's construction of the statutes and rules which it administers is incorrect, as NPS is not empowered to administer the CDA. That task rests with agency contracting officers and boards of contract appeals, as well as the federal courts; and any authority regarding the agency boards' proper arrangement belongs to the Administrator for Federal Procurement Policy. Consequently, §51.3 is nothing more than a general policy statement designed to inform the public of NPS' views on the CDA's proper application. Thus, §51.3 does not create "adverse effects of a strictly legal kind," which are required for a hardship showing. Ohio Forestry Assn., Inc. v. Sierra Club, 523 U. S. 726, 733. Moreover, §51.3 does not affect a concessioner's primary conduct, e.g., Toilet Goods Assn., Inc. v. Gardner, 387 U. S. 158, 164, as it leaves the concessioner free to conduct its business as it sees fit. Moreover, nothing in the regulation prevents concessioners from following the procedures set forth in the CDA once a dispute over a concession contract actually arises. This Court has previously found that challenges to regulations similar to §51.3 were not ripe for lack of a hardship showing. See, e.g., id., at 161-162. Petitioner's contention that delaying judicial resolution of the issue will cause real harm because the CDA's applicability vel non is a factor taken into account by a concessioner preparing its bids is unpersuasive. Mere uncertainty as to the validity of a legal rule does not constitute a hardship for purposes of the ripeness analysis. As to whether the issue here is fit for review, further factual development would "significantly advance [this Court's] ability to deal with the legal issues presented," Duke Power Co. v. Carolina Environmental Study Group, Inc., 438 U. S. 59, 82, even though the question is "purely legal" and § 51.3 constitutes "final agency action" under the Administrative Procedure Act, Abbott Laboratories, supra, at 149. Judicial resolution of the question presented here should await a concrete dispute about a particular concession contract. Pp. 4-9.
 282 F. 3d 818, vacated and remanded.
 THOMAS, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and SCALIA, KENNEDY, SOUTER, and GINSBURG, JJ., joined. STEVENS, J., filed an opinion concurring in the judgment. BREYER, J., filed a dissenting opinion, in which O'CONNOR, J., joined.
 JUSTICE THOMAS delivered the opinion of the Court.
 
 
 1
 Petitioner, a nonprofit trade association that represents concessioners doing business in the national parks, challenges a National Park Service (NPS) regulation that purports to render the Contract Disputes Act of 1978 (CDA), 92 Stat. 2383, 41 U. S. C. §601 et seq., inapplicable to concession contracts. We conclude that the controversy is not yet ripe for judicial resolution.
 
 
 2
 * The CDA establishes rules governing disputes arising out of certain Government contracts.[1] The statute provides that these disputes first be submitted to an agency's contracting officer. §605. A Government contractor dissatisfied with the contracting officer's decision may seek review either from the United States Court of Federal Claims or from an administrative board in the agency. See §§606, 607(d), 609(a). Either decision may then be appealed to the United States Court of Appeals for the Federal Circuit.[2] See 28 U. S. C. §1295; 41 U. S. C. §607(g).
 
 
 3
 Since 1916 Congress has charged NPS to "promote and regulate the use of the Federal areas known as national parks," "conserve the scenery and the natural and historic objects and the wild life therein," and "provide for [their] enjoyment [in a way that] will leave them unimpaired for the enjoyment of future generations." An Act To establish a National Park Service, 39 Stat. 535, 16 U. S. C. §1. To make visits to national parks more enjoyable for the public, Congress authorized NPS to "grant privileges, leases, and permits for the use of land for the accommodation of visitors." §3, 39 Stat. 535. Such "privileges, leases, and permits" have become embodied in national parks concession contracts.
 
 
 4
 The specific rules governing national parks concession contracts have changed over time. In 1998, however, Congress enacted the National Parks Omnibus Management Act of 1998 (1998 Act or Act), Pub. L. 105-391, 112 Stat. 3497 (codified with certain exceptions in 16 U. S. C. §§ 5951-5966), establishing a new and comprehensive concession management program for national parks. The 1998 Act authorizes the Secretary of the Interior to enact regulations implementing the Act's provisions, §5965.
 
 
 5
 NPS, to which the Secretary has delegated her authority under the 1998 Act, promptly began a rulemaking proceeding to implement the Act. After notice and comment, final regulations were issued in April 2000. 65 Fed. Reg. 20630 (2000) (codified in 36 CFR pt. 51). The regulations define the term "concession contract" as follows:
 
 
 6
 "A concession contract (or contract) means a binding written agreement between the Director and a concessioner .... Concession contracts are not contracts within the meaning of 41 U. S. C. 601 et seq. (the Contract Disputes Act) and are not service or procurement contracts within the meaning of statutes, regulations or policies that apply only to federal service contracts or other types of federal procurement actions."[3] 36 CFR §51.3 (2002).
 
 
 7
 Through this provision NPS took a position with respect to a longstanding controversy with the Department of Interior's Board of Contract Appeals (IBCA). Beginning in 1989, the IBCA ruled that NPS concession contracts were subject to the CDA, see R & R Enterprises, 89-2 B. C. A., ¶21708, pp. 109145-109147 (1989), and subsequent attempts by NPS to convince the IBCA otherwise proved unavailing, National Park Concessions, Inc., 94-3 B. C. A., ¶27104, pp. 135096-135098 (1994).
 
 II
 
 8
 Petitioner challenged the validity of §51.3 in the District Court for the District of Columbia. Amfac Resorts, L. L. C. v. United States Dept. of Interior, 142 F. Supp. 2d 54, 80-82 (2001). The District Court upheld the regulation, applying the deference principle of Chevron U. S. A. Inc. v. Natural Resources Defense Council, Inc., 467 U. S. 837 (1984). The court concluded that the CDA is ambiguous on whether it applies to concession contracts and found NPS' interpretation of the CDA reasonable. 142 F. Supp. 2d, at 80-82.
 
 
 9
 The Court of Appeals for the District of Columbia Circuit affirmed, albeit on different grounds. Amfac Resorts, L. L. C. v. United States Dept. of Interior, 282 F. 3d 818, 834-835 (2002). Recognizing that NPS "does not administer the [CDA], and thus may not have interpretative authority over its provisions," the court placed no reliance on Chevron but simply "agree[d]" with NPS' reading of the CDA, finding that reading consistent with both the CDA and the 1998 Act. 282 F. 3d, at 835. We granted certiorari to consider whether the CDA applies to contracts between NPS and concessioners in the national parks. 537 U. S. 1018 (2002). Because petitioner has brought a facial challenge to the regulation and is not litigating any concrete dispute with NPS, we asked the parties to provide supplemental briefing on whether the case is ripe for judicial action. Tr. of Oral Arg. 62.
 
 III
 
 10
 Ripeness is a justiciability doctrine designed "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." Abbott Laboratories v. Gardner, 387 U. S. 136, 148-149 (1967); accord, Ohio Forestry Assn., Inc. v. Sierra Club, 523 U. S. 726, 732-733 (1998). The ripeness doctrine is "drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction," Reno v. Catholic Social Services, Inc., 509 U. S. 43, 57, n. 18 (1993) (citations omitted), but, even in a case raising only prudential concerns, the question of ripeness may be considered on a court's own motion. Ibid. (citing Regional Rail Reorganization Act Cases, 419 U. S. 102, 138 (1974)).
 
 
 11
 Determining whether administrative action is ripe for judicial review requires us to evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration. Abbott Laboratories, supra, at 149. "Absent [a statutory provision providing for immediate judicial review], a regulation is not ordinarily considered the type of agency action `ripe' for judicial review under the [Administrative Procedure Act (APA)] until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him. (The major exception, of course, is a substantive rule which as a practical matter requires the plaintiff to adjust his conduct immediately....)" Lujan v. National Wildlife Federation, 497 U. S. 871, 891 (1990). Under the facts now before us, we conclude this case is not ripe.
 
 
 12
 We turn first to the hardship inquiry. The federal respondents concede that, because NPS has no delegated rulemaking authority under the CDA, the challenged portion of §51.3 cannot be a legislative regulation with the force of law. See Brief for Federal Respondents 15, n. 6; Supplemental Brief for Federal Respondents 6. They note, though, that "agencies may issue interpretive rules `to advise the public of the agency's construction of the statutes and rules which it administers,'" Brief for Federal Respondents 15, n. 6 (quoting Shalala v. Guernsey Memorial Hospital, 514 U. S. 87, 99 (1995)) (emphasis added), and seek to characterize §51.3 as such an interpretive rule.
 
 
 13
 We disagree. Unlike in Guernsey Memorial Hospital, where the agency issuing the interpretative guideline was responsible for administering the relevant statutes and regulations, NPS is not empowered to administer the CDA. Rather, the task of applying the CDA rests with agency contracting officers and boards of contract appeals, as well as the Federal Court of Claims, the Court of Appeals for the Federal Circuit, and, ultimately, this Court. Moreover, under the CDA, any authority regarding the proper arrangement of agency boards belongs to the Administrator for Federal Procurement Policy. See 41 U. S. C. §607(h) ("Pursuant to the authority conferred under the Office of Federal Procurement Policy Act [41 U. S. C. §401 et seq.], the Administrator is authorized and directed, as may be necessary or desirable to carry out the provisions of this chapter, to issue guidelines with respect to criteria for the establishment, functions, and procedures of the agency boards . . ."). Consequently, we consider §51.3 to be nothing more than a "general statemen[t] of policy" designed to inform the public of NPS' views on the proper application of the CDA. 5 U. S. C. §553(b)(3)(A).
 
 
 14
 Viewed in this light, §51.3 does not create "adverse effects of a strictly legal kind," which we have previously required for a showing of hardship. Ohio Forestry Assn., Inc., 523 U. S., at 733. Just like the Forest Service plan at issue in Ohio Forestry, §51.3 "do[es] not command anyone to do anything or to refrain from doing anything; [it] do[es] not grant, withhold, or modify any formal legal license, power, or authority; [it] do[es] not subject anyone to any civil or criminal liability; [and it] create[s] no legal rights or obligations." Ibid.
 
 
 15
 Moreover, §51.3 does not affect a concessioner's primary conduct. Toilet Goods Assn., Inc. v. Gardner, 387 U. S. 158, 164 (1967); Ohio Forestry Assn., supra, at 733-734. Unlike the regulation at issue in Abbott Laboratories, which required drug manufacturers to change the labels, advertisements, and promotional materials they used in marketing prescription drugs on pain of criminal and civil penalties, see 387 U. S., at 152-153, the regulation here leaves a concessioner free to conduct its business as it sees fit. See also Gardner v. Toilet Goods Assn., Inc., 387 U. S. 167, 171 (1967) (regulations governing conditions for use of color additives in foods, drugs, and cosmetics were "selfexecuting" and had "an immediate and substantial impact upon the respondents").
 
 
 16
 We have previously found that challenges to regulations similar to §51.3 were not ripe for lack of a showing of hardship. In Toilet Goods Assn., for example, the Food and Drug Administration (FDA) issued a regulation requiring producers of color additives to provide FDA employees with access to all manufacturing facilities, processes, and formulae. 387 U. S., at 161-162. We concluded the case was not ripe for judicial review because the impact of the regulation could not "be said to be felt immediately by those subject to it in conducting their day-to-day affairs" and "no irremediabl[y] adverse consequences flow[ed] from requiring a later challenge." Id., at 164. Indeed, the FDA regulation was more onerous than §51.3 because failure to comply with it resulted in the suspension of the producer's certification and, consequently, could affect production. See id., at 165, and n. 2. Here, by contrast, concessioners suffer no practical harm as a result of §51.3. All the regulation does is announce the position NPS will take with respect to disputes arising out of concession contracts. While it informs the public of NPS' view that concessioners are not entitled to take advantage of the provisions of the CDA, nothing in the regulation prevents concessioners from following the procedures set forth in the CDA once a dispute over a concession contract actually arises. And it appears that, notwithstanding §51.3, the IBCA has been quite willing to apply the CDA to certain concession contracts. Watch Hill Concessions, Inc., 01-1 B. C. A., ¶31298, pp. 154520-154521 (IBCA 2001) (concluding that concession contract was subject to the CDA despite the contrary language in §51.3).
 
 
 17
 Petitioner contends that delaying judicial resolution of this issue will result in real harm because the applicability vel non of the CDA is one of the factors a concessioner takes into account when preparing its bid for NPS concession contracts. See Supplemental Brief for Petitioner 4-6. Petitioner's argument appears to be that mere uncertainty as to the validity of a legal rule constitutes a hardship for purposes of the ripeness analysis. We are not persuaded. If we were to follow petitioner's logic, courts would soon be overwhelmed with requests for what essentially would be advisory opinions because most business transactions could be priced more accurately if even a small portion of existing legal uncertainties were resolved.[4] In short, petitioner has failed to demonstrate that deferring judicial review will result in real hardship.
 
 
 18
 We consider next whether the issue in this case is fit for review. Although the question presented here is "a purely legal one" and §51.3 constitutes "final agency action" within the meaning of §10 of the APA, 5 U. S. C. §704, Abbott Laboratories, supra, at 149, we nevertheless believe that further factual development would "significantly advance our ability to deal with the legal issues presented," Duke Power Co. v. Carolina Environmental Study Group, Inc., 438 U. S. 59, 82 (1978); accord, Ohio Forestry Assn., Inc., 523 U. S., at 736-737; Toilet Goods Assn., supra, at 163. While the federal respondents generally argue that NPS was correct to conclude that the CDA does not cover concession contracts, they acknowledge that certain types of concession contracts might come under the broad language of the CDA. Brief for Federal Respondents 33-34. Similarly, while petitioner and respondent Xanterra Parks & Resorts, LLC, present a facial challenge to §51.3, both rely on specific characteristics of certain types of concession contracts to support their positions. See Brief for Petitioner 21-23, 36; Brief for Respondent Xanterra Parks & Resorts, LLC, 20, 22. In light of the foregoing, we conclude that judicial resolution of the question presented here should await a concrete dispute about a particular concession contract.
 
 
 19
 * * *
 
 
 20
 For the reasons stated above, we vacate the judgment of the Court of Appeals insofar as it addressed the validity of §51.3 and remand with instructions to dismiss the case with respect to this issue.
 
 
 21
 
 It is so ordered.
 
 
 
 
 Notes:
 
 
 [1]
 Title 41 U. S. C. §602(a) provides:
 "Unless otherwise specifically provided herein, this chapter applies to any express or implied contract (including those of the nonappropriated fund activities described in sections 1346 and 1491 of title 28) entered into by an executive agency for—
 "(1) the procurement of property, other than real property in being;
 "(2) the procurement of services;
 "(3) the procurement of construction, alteration, repair or maintenance of real property; or,
 "(4) the disposal of personal property."
 
 
 [2]
 The CDA also provides that a prevailing contractor is entitled to prejudgment interest. §611
 
 
 [3]
 For ease of reference, throughout this opinion we will refer to the second sentence quoted in the text as §51.3
 
 
 [4]
 Petitioner notes that its complaint challenged not only the regulation but also two specific prospectuses issued by NPS in late 2000. Thus, petitioner argues, even if the first challenge is not ripe, the latter two are reviewable under the Tucker Act, 28 U. S. C. §1491(b)(1). See Supplemental Brief for Petitioner 6-8. Petitioner did not seek certiorari review on these issues; accordingly, we decline to consider them. See this Court's Rule 14.1(a);Yee v. Escondido, 503 U. S. 519, 535-536 (1992).
 Similarly, JUSTICE BREYER's reliance on the Tucker Act to show that the hardship requirement of Abbott Laboratories v. Gardner, 387 U. S. 136 (1967), has been satisfied, see post, at 4-5 (dissenting opinion), is misplaced. The fact that one "congressional statute" authorizes "immediate judicial relief from [certain types of] agency determinations," ibid., says nothing about whether "immediate judicial review" is advisable for challenges brought against other types of agency actions based on a different statute.
 
 
 
 22
 JUSTICE STEVENS, concurring in the judgment.
 
 
 23
 Petitioner seeks this Court's resolution of the straightforward legal question whether the Contract Disputes Act of 1978 (CDA), 41 U. S. C. §601 et seq., applies to concession contracts with the National Park Service. Though this question is one that would otherwise be appropriate for this Court to decide, in my view petitioner has not satisfied the threshold requirement of alleging sufficient injury to invoke federal-court jurisdiction. If such allegations of injury were present, however, this case would not raise any of the concerns that the ripeness doctrine was designed to avoid.
 
 
 24
 * The CDA provides certain significant protections for private parties contracting with federal agencies. It authorizes de novo review of a contractor's disputed decision, payment of prejudgment interest if a dispute with the agency is resolved in the contractor's favor, and expedited procedures for resolving minor disputes. §§ 607-612. The value to contractors of these protections have not been quantified in this case, but they are unquestionably significant.
 
 
 25
 Ever since the enactment of the CDA in 1978, the National Park Service has insisted that the statute does not apply to contracts with concessionaires who operate restaurants, lodges, and gift shops in the national parks. See, e.g., Lodging of Federal Respondents 1. In its view, the statute applies to Government contracts involving the procurement of goods or services that the Government agrees to pay for, not to licenses issued by the Government to concessionaires who sell goods and services to the public. After the enactment of the National Parks Omnibus Management Act of 1998, 16 U. S. C. §§ 5951-5966, the Park Service issued a regulation restating that position. 36 CFR §51.3 (2002). There is nothing tentative or inconclusive about the agency's position. The promulgation of the regulation indicated that the agency had determined that a clear statement of its interpretation of the CDA would be useful to potential concessionaires bidding for future contracts. Under the Park Service's view, nearly 600 concession contracts in 131 national parks fall outside of the CDA. Lodging of Federal Respondents 6.
 
 
 26
 Petitioner is a trade association whose members are parties to such contracts and periodically enter into negotiations for future contracts. They are undisputedly interested in knowing whether disputes that are sure to arise under some of those contracts will be resolved pursuant to the CDA procedures or the less favorable procedures that will apply if the Park Service regulation is valid.
 
 II
 
 27
 In our leading case discussing the "ripeness doctrine" we explained that the question whether a controversy is "ripe" for judicial resolution has a "twofold aspect, requiring us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." Abbott Laboratories v. Gardner, 387 U. S. 136, 148-149 (1967). Both aspects of the inquiry involve the exercise of judgment, rather than the application of a black-letter rule.
 
 
 28
 The first aspect is the more important and it is satisfied in this case. The CDA applies to any express or implied contract for the procurement of property, services, or construction. 41 U. S. C. §602(a). In the view of the Park Service, a procurement contract is one that obligates the Government to pay for goods and services that it receives, whereas concession contracts authorize third parties to provide services to park area visitors. Petitioner, on the other hand, argues that the contracts provide for the performance of services that discharge a public duty even though the Government does not pay the concessionaires. Whichever view may better reflect the intent of the Congress that enacted the CDA, it is perfectly clear that this question of statutory interpretation is as "fit" for judicial decision today as it will ever be. Even if there may be a few marginal cases in which the applicability of the CDA may depend on unique facts, the regulation's blanket exclusion of concession contracts is either a correct or an incorrect interpretation of the statute. The issue has been fully briefed and argued and, in my judgment, is ripe for decision.
 
 
 29
 The second aspect of the ripeness inquiry is less clear and less important. If there were reason to believe that further development of the facts would clarify the legal question, or that the agency's view was tentative or apt to be modified, only a strong showing of hardship to the parties would justify a prompt decision. In this case, it is probably correct that the hardship associated with a delayed decision is minimal. On the other hand, as the Park Service's decision to promulgate the regulation demonstrates, eliminating the present uncertainty about the applicable dispute resolution procedures will provide a benefit for all interested parties. If petitioner had alleged sufficient injury arising from the Park Service's position, I would favor the exercise of our discretion to consider the case ripe for decision. Because such an allegation of injury is absent, however, petitioner does not have standing to have this claim adjudicated.
 
 III
 
 30
 To establish an Article III case or controversy, a litigant must establish that he has "standing." Whitmore v. Arkansas, 495 U. S. 149, 155 (1990). To have standing, a "plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." Allen v. Wright, 468 U. S. 737, 751 (1984). This requirement specifically applies to parties challenging the validity of administrative regulations. See Sierra Club v. Morton, 405 U. S. 727, 735 (1972).
 
 
 31
 In the complaint filed in the District Court, petitioner alleged that the resolution of the merits of its dispute over the validity of the Park Service regulation was important, but it failed to allege that the existence of the regulation had caused any injury to it or to its members:
 
 
 32
 "The applicability of the CDA to concession contracts is important to concessioners because NPS concession contracts are of lengthy duration, often require significant upfront financial commitments, and by their terms provide the agency with broad unilateral discretion to alter many aspects of those contracts over time. The unlawful decision by the NPS to exempt itself from the CDA is thus of great importance to the contract solicitation process." App. 22.
 
 
 33
 At oral argument, counsel reiterated that the resolution of this question was "important" and that concessionaires "need to know now, in terms of deciding whether to bid on certain contracts, what their rights are under those contracts." Tr. of Oral Arg. 7-8. After argument, when asked to brief the issue of ripeness, petitioner stated that its members "need to know before a dispute arises—and in fact, before deciding whether to bid on a concessions contract —what procedural mechanisms will apply to contractual disputes," and that "the prices at which concessioners `compete for Government contract business' would be directly affected." Supplemental Brief for Petitioner 1, 5 (citations omitted). It is fair to infer from the record before us, however, that petitioner's members have bid on, and been awarded, numerous contracts without having the benefit of a definitive answer to the important legal question that their complaint has identified.
 
 
 34
 Neither in its complaint in the District Court, nor in its briefing or argument before this Court, has petitioner identified a specific incident in which the Park Service's regulation caused a concessionaire to refuse to bid on a contract, to modify its bid, or to suffer any other specific injury. Rather, petitioner has focused entirely on the importance of knowing whether the Park Service's position is valid. While it is no doubt important for petitioner and its members to know as much as possible about the future of their business transactions, importance does not necessarily establish injury. Though some of petitioner's members may well have suffered some sort of injury from the Park Service's regulation, neither the allegations of the complaint nor the evidence in the record identifies any specific injury that would be redressed by a favorable decision on the merits of the case. Accordingly, petitioner has no standing to pursue its claim.
 
 
 35
 For this reason, I concur in the Court's judgment.
 
 
 36
 JUSTICE BREYER, with whom JUSTICE O'CONNOR joins, dissenting.
 
 
 37
 Like the majority, I believe that petitioner National Park Hospitality Association has standing here to pursue its legal claim, namely, that the dispute resolution procedures set forth in the Contract Disputes Act of 1978 (CDA), 41 U. S. C. §601 et seq., apply to national park concession contracts. But, unlike the majority, I believe that the question is ripe for our consideration.
 
 
 38
 I cannot agree with JUSTICE STEVENS that the trade association lacks Article III standing to bring suit on behalf of its members. See ante, at 4-5 (opinion concurring in judgment). In my view, the National Park Service's definition of "concession contract" to exclude the CDA's protections (a definition embodied in the regulation about which the Association complains, see 36 CFR §51.3 (2002)) causes petitioner and its members "injury in fact." Lujan v. Defenders of Wildlife, 504 U. S. 555, 560 (1992) (discussing requirements of "injury in fact," causation, and redressability); see also Hunt v. Washington State Apple Advertising Comm'n, 432 U. S. 333, 343 (1977) (association's standing based on injury to a member).
 
 
 39
 For one thing, many of petitioner's members are parties to, as well as potential bidders for, park concession contracts. Lodging for Federal Respondents 6 (listing 590 concession contracts in 131 parks). Those members will likely find that disputes arise under the contracts. And in resolving such disputes, the Park Service, following its regulation, will reject the concessioners' entitlement to the significant protections or financial advantages that the CDA provides. See 41 U. S. C. §§605-612; ante, at 1-2 (STEVENS, J., concurring in judgment). In the circumstances present here, that kind of injury, though a future one, is concrete and likely to occur.
 
 
 40
 For another thing, the challenged Park Service interpretation causes a present injury. If the CDA does not apply to concession contract disagreements, as the Park Service regulation declares, then some of petitioner's members must plan now for higher contract implementation costs. Given the agency's regulation, bidders will likely be forced to pay more to obtain, or to retain, a concession contract than they believe the contract is worth. That is what the Association argues. Supplemental Brief for Petitioner 4-6. See also App. to Supplemental Brief for Petitioner 3a-4a. Certain general allegations in the underlying complaints support this claim. See, e.g., App. 20-22, ¶¶35, 61-67; Amfac Resorts, L. L. C. Complaint in No. 1:00CV02838 (DC), pp. 4-5, ¶8 (available in Clerk of Court's case file); id., at 31-33, ¶¶102-111. Cf. Amfac Resorts, L. L. C. v. United States Dept. of Interior, 282 F. 3d 818, 830 (CADC 2002). And several uncontested circumstances indicate that such allegations are likely to prove true.
 
 
 41
 First, as the record makes clear, the trade association has a widespread membership, and many of its members regularly bid on contracts that, through cross-references to the Park Service regulation, embody the Park Service's interpretation. See, e.g., App. 69, 80; Lodging for Federal Respondents 14, 25. See also Standard Concession Contract, 65 Fed. Reg. 26052, 26063, 26065 (2000); Simplified Concession Contracts, id., at 44898, 44899-44900, 44910, 44912. Second, related contract solicitations are similarly widespread and recurring, involving numerous bidders. Third, after investigation, the relevant congressional committee found that the "way potential contractors view the disputes-resolving system influences how, whether, and at what prices they compete for government contract business." S. Rep. No. 95-1118, p. 4 (1978). Fourth, the CDA provides a prevailing contractor with prejudgment interest, and authorizes expedited procedures. 41 U. S. C. §§607(f), 608, 611. These are factors that make the inapplicability of the CDA more costly to successful bidders. See S. Rep. No. 95-1118, at 2-4; ante, at 1-2 (STEVENS, J., concurring in judgment).
 
 
 42
 These circumstances make clear that petitioner's members will likely suffer a concrete monetary harm, either now or in the foreseeable future. Such a showing here is sufficient to satisfy the Constitution's standing requirements. And the threatened injuries, present and future— monetary harm, injuries to a potential or actual contractual relationship, and injuries that arguably fall within the CDA's protective scope—are sufficient to satisfy "prudential" standing requirements as well. See Federal Election Comm'n v. Akins, 524 U. S. 11, 19-20 (1998); Association of Data Processing Service Organizations, Inc. v. Camp, 397 U. S. 150, 153 (1970). Cf. Columbia Broadcasting System, Inc. v. United States, 316 U. S. 407, 421-422 (1942).
 
 
 43
 Given this threat of immediate concrete harm (primarily in the form of increased bidding costs), this case is also ripe for judicial review. As JUSTICE STEVENS explains in Parts I and II of his opinion, the case now presents a legal issue—the applicability of the CDA to concession contracts —that is fit for judicial determination. That issue is a purely legal one, demanding for its resolution only use of ordinary judicial interpretive techniques. See ante, at 3 (opinion concurring in judgment). The relevant administrative action, i.e., the agency's definition of "concession contract" under the National Parks Omnibus Management Act of 1998, 16 U. S. C. §§5951-5966, has been "formalized," Abbott Laboratories v. Gardner, 387 U. S. 136, 148 (1967). It is embodied in an interpretive regulation issued after notice and public comment and pursuant to the Department of the Interior's formal delegation to the National Park Service of its own statutorily granted rulemaking authority, §5965; ante, at 2-3. (Unlike the majority, I would apply to the regulation the legal label "interpretive rule," not "general statement of policy," ante, at 6 (internal quotation marks and alteration omitted), though I agree with the majority that, because the Park Service does not administer the CDA, see ante, at 5-6, we owe its conclusion less deference.) The Park Service's interpretation is definite and conclusive, not tentative or likely to change; as the majority concedes, the Park Service's determination constitutes "final agency action" within the meaning of the Administrative Procedure Act. Ante, at 8 (internal quotation marks omitted).
 
 
 44
 The only open question concerns the nature of the harm that refusing judicial review at this time will cause the Association's members. See Abbott Laboratories, supra, at 149. The fact that concessioners can raise the legal question at a later time, after a specific contractual dispute arises, see ante, at 9, militates against finding this case ripe. So too does a precedential concern: Will present review set a precedent that leads to premature challenges in other cases where agency interpretations may be less formal, less final, or less well suited to immediate judicial determination? See ante, at 8.
 
 
 45
 But the fact of immediate and particularized (and not totally reparable) injury during the bidding process offsets the first of these considerations. And the second is more than offset by a related congressional statute that specifies that prospective bidders for Government contracts can obtain immediate judicial relief from agency determinations that unlawfully threaten precisely this kind of harm. See 28 U. S. C. §1491(b)(1) (allowing prospective bidder to object, for instance, to "solicitation by a Federal agency for bids . . . for a proposed contract" and permitting review of related allegation of "any . . . violation of statute or regulation in connection with a procurement or a proposed procurement"). See also R. Nash, S. Schooner, & K. O'Brien, The Government Contracts Reference Book 308, 423 (2d ed. 1998). This statute authorizes a potential bidder to complain of a proposed contractual term that, in the bidder's view, is unlawful, say, because it formally incorporates a regulation that embodies a specific, allegedly unlawful, remedial requirement. Cf. App. 25, ¶¶114-116 (excerpts from petitioner's complaint making just this claim); App. to Supplemental Brief for Petitioner 2a, ¶¶121-122 (same). That being so, i.e., the present injury in such a case being identical to the present injury at issue here, I can find no convincing prudential reason to withhold Administrative Procedure Act review.
 
 
 46
 In sum, given this congressional policy, the concrete nature of the injury asserted by petitioner, and the final nature of the agency action at issue, I see no good reason to postpone review. I would find the issue ripe for this Court's consideration. And I would affirm the decision of the Court of Appeals on the merits, primarily for the reasons set forth in its opinion as supplemented here by the Government.