388 F.3d 701
 NATURAL RESOURCES DEFENSE COUNCIL; Snake River Alliance; Confederated Tribes & Bands of the Yakama Indian Nation; Shoshone Bannock Tribes, Plaintiffs-Appellees,
v.
Spencer ABRAHAM, Secretary, Department of Energy; United States of America, Defendants-Appellants.
 No. 03-35711.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted October 5, 2004.
 Filed November 5, 2004.
 
 Ronald M. Spritzer, United States Department of Justice, Environment & Natural Resources Division, Washington, DC, for the defendants-appellants.
 Geoffrey H. Fettus, Natural Resources Defense Council, Washington, DC; Raymond C. Givens, Givens Law Firm, Coeur d'Alene, ID; Dan Israel, Shoshone-Bannock Tribes, Boulder, CO, for the plaintiffs-appellees.
 David K. Mears, Senior Assistant Attorney General, Olympia, WA, for amici curiae State of Idaho, State of Oregon, State of New Mexico, State of New York, State of South Carolina, State of Washington, and the New York State Energy Research and Development Authority.
 Appeal from the United States District Court for the District of Idaho; B. Lynn Winmill, District Judge, Presiding. D.C. No. CV-01-00413-BLW.
 Before: KOZINSKI, FERNANDEZ, and CLIFTON, Circuit Judges.
 FERNANDEZ, Circuit Judge:
 
 
 1
 The United States Department of Energy (DOE) appeals the district court's grant of summary judgment to the Natural Resources Defense Council, Confederated Tribes and Bands of the Yakama Nation, Snake River Alliance, and Shoshone-Bannock Tribes (collectively NRDC) in their action to obtain a declaration that DOE Order 435.1 is at least partially invalid. As we noted when the dispute was first before us in an attempt to obtain direct appellate review of the Order, "[t]his case involves ... Order 435.1, together with its Manual and Implementation Guide, which provide (among other things) a process for determining whether certain radioactive waste streams are `waste incidental to reprocessing' that are not considered `high-level waste.'" Natural Res. Def. Council, Inc. v. Abraham, 244 F.3d 742, 742 (9th Cir.2001) (NRDC I).
 
 
 2
 We then determined that we did not have direct appellate jurisdiction, and transferred the petition, together with all issues of standing, ripeness and, of course, the merits, to the district court. Id. at 747-48. The district court determined that the case was ripe and decided the merits against DOE. We do not agree with the ripeness determination and, therefore, vacate the district court's judgment and remand with directions to dismiss.
 
 BACKGROUND
 
 3
 When DOE issued Order 435.1 (the Order) on July 9, 1999, its declared objective was to "ensure that all[DOE] radioactive waste is managed in a manner that is protective of worker and public health and safety, and the environment." Id. ¶ 1. The Radioactive Waste Management Manual (DOE M 435.1-1) and the Implementation Guide for Use with DOE M 435.1-1 complement the Order and are, indeed, integral to its meaning and use. A DOE directive on July 9, 1999, described the effect of the three documents in the following way:
 
 
 4
 The Order ensures that all [DOE] radioactive waste is managed in a manner that is protective of the worker and public health and safety, and the environment. The Manual further describes the requirements and establishes specific responsibilities for implementing the Order for the management of DOE high-level waste, transuranic waste, low-level waste, and the radioactive component of mixed waste. The Guide aids in understanding what is necessary to attain compliance, facilitates effective and efficient implementation of the requirements, and offers acceptable ways to implement the requirement[s].
 
 
 5
 Those seem like laudable goals, but NRDC asserts that when the Order is applied and implemented, DOE will, in fact, construe and use it in a way that redefines high-level radioactive waste as waste incidental to reprocessing and thereby reduces it to handling as mere low-level radioactive waste or transuranic waste. As a result, argues NRDC, DOE will violate the provisions of the Nuclear Waste Policy Act of 1982, 42 U.S.C. §§ 10101-10270 (NWPA). The NWPA decidedly does not purport to control DOE's management of nuclear waste. Indeed, it recognizes DOE's managerial authority. See 42 U.S.C. §§ 10101(3)(E), 10107(a). When it comes to high-level waste, however, NRDC contends that permanent disposal is quite another matter. To place that in context, we will repeat what we said when this matter was previously before us.[1]
 
 
 6
 "`In the NWPA, Congress created a comprehensive scheme for the interim storage and permanent disposal of high-level radioactive waste generated by civilian nuclear power plants.'" Indiana Michigan Power Co. v. Department of Energy, 88 F.3d 1272, 1273 (D.C.Cir.1996). Section 10107(a) provides that NWPA does not apply to any atomic energy defense activity or facility. NRDC acknowledges that NWPA does not require defense high-level waste to be disposed in a repository, but points out that it does require the President to evaluate potential methods for disposing of such waste. 42 U.S.C. § 10107(b)(1). Because the President determined on April 30, 1985, that a separate facility was not necessary for defense high-level waste, NRDC notes that DOE only has authority for disposal of defense high-level wastes [pursuant to NWPA].
 
 
 7
 While this may be true, DOE Order 435.1 addresses management of wastes at DOE facilities. The authority to do so comes from the Atomic Energy Act (AEA), 42 U.S.C. § 2151 et seq.; the Energy Reorganization Act (ERA), Pub.L. No. 98-438, 88 Stat. 1233, codified at 42 U.S.C. § 5801 et seq.; and the Department of Energy Organization Act (DEO), Pub.L. No. 95-91, 91 Stat. 565, codified at 42 U.S.C. § 7101 et seq.
 
 
 8
 The AEA, enacted in 1954, established a comprehensive regulatory scheme for military and domestic nuclear energy. It authorized the Atomic Energy Commission (AEC)—now DOE and NRC [Nuclear Regulatory Commission]—to establish instructions by rule, regulation, or order, governing possession and use of nuclear material and the operation of facilities used in conducting its activities. When the AEC was abolished in 1974, its functions were transferred to the Energy Research and Development Agency (ERDA), DOE's predecessor agency, and to the NRC. See Energy Reorganization Act of 1974(ERA), Pub.L. No. 93-438 §§ 104, 201, 88 Stat. 1233, 1237-38, 1242-44, codified at 42 U.S.C. § 5814. Under the ERA, NRC was given commercial licensing and related regulatory functions; the ERDA took over the rest of AEC's functions, except that the NRC must license ERDA facilities that are authorized for `subsequent long-term storage of high-level radioactive waste generated by the Administration.' 42 U.S.C. § 5842.... In 1977, Congress abolished ERDA and transferred its functions to DOE. See DEO, § 301(a), Pub.L. No. 95-91, 91 Stat. 565, 577-78 (1977), codified at 42 U.S.C. § 7151(a). This left control over existing government facilities and defense nuclear waste in DOE. See 42 U.S.C. § 7133(a)(8)(A), (B), (C), and (E).
 
 
 9
 DOE Order 435.1 was promulgated in accordance with the AEA to replace a previous DOE Order on Radioactive Waste Management, DOE O 5820.2A, and applies to the management of all high-level waste, transuranic waste, and low-level waste for which DOE is responsible." NRDC I, 244 F.3d at 744-45 (footnotes omitted).
 
 
 10
 We are asked to decide what we left open in NRDC I: that NWPA applies to DOE's defense waste disposal decisions, and further that DOE will now use the Order, and its congeners, to bypass the strictures of NWPA and to permanently dispose of high-level waste in a place other than the joint repository that Congress and the President contemplated when they acted. See 42 U.S.C. § 10107(b), (c). But is it too soon to decide that? Is ripeness lacking? We are satisfied that the answer is yes for the reasons we will now explain.
 
 DISCUSSION
 
 11
 Although the district court did decide that this case was ripe, that is an issue that we must decide de novo. See Chang v. United States, 327 F.3d 911, 921 (9th Cir.2003). The district court felt that there was no particular reason to wait until DOE had actually applied the Order and its contemplated processes to some particular situation existing at some particular site and, in so doing, had actually come into conflict with NWPA. We differ with that view.
 
 
 12
 NRDC seeks to prevent DOE from proceeding to apply the Order, which on its face is designed to manage defense nuclear waste by first determining what kind of waste it will ultimately have on its hands (after reprocessing) and then dealing with that waste accordingly. NRDC, therefore, wants declaratory and injunctive relief against DOE. But "[t]he injunctive and declaratory judgment remedies are discretionary, and courts traditionally have been reluctant to apply them to administrative determinations unless these arise in the context of a controversy `ripe' for judicial resolution." Abbott Labs. v. Gardner, 387 U.S. 136, 148, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967), overruled on other grounds by Califano v. Sanders, 430 U.S. 99, 105, 97 S.Ct. 980, 984, 51 L.Ed.2d 192 (1977). And:
 
 
 13
 Ripeness is a justiciability doctrine designed "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties."
 
 
 14
 Nat'l Park Hospitality Ass'n v. Dep't of the Interior, 538 U.S. 803, 807-08, 123 S.Ct. 2026, 2030, 155 L.Ed.2d 1017 (2003). All of that, in turn, requires a court "to evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." Id. at 808, 123 S.Ct. at 2030.
 
 
 15
 The abstruse and abstract arguments by the parties show that this case is not presently fit for review. No doubt DOE took a final and formal action in some sense when, after years of study and comment, it promulgated the Order. But that must be looked at in a pragmatic way. See Abbott, 387 U.S. at 149, 87 S.Ct. at 1516. There are times when "further factual development would `significantly advance our ability to deal with the legal issues presented' and would `aid us in their resolution.'" Ohio Forestry Ass'n v. Sierra Club, 523 U.S. 726, 737, 118 S.Ct. 1665, 1672, 140 L.Ed.2d 921 (1998). Often, it helps when "factual components [are] fleshed out, by some concrete action." Id. (internal quotation marks omitted). There simply are times when "further factual development would `significantly advance our ability to deal with the legal issues presented.'" Nat'l Park Hospitality, 538 U.S. at 812, 123 S.Ct. at 2032. This is decidedly one of those times.
 
 
 16
 For example, NRDC detects minute differences between the definition of high-level waste in NWPA[2] and the definition in the Manual,[3] but as we see it, the differences are inconsequential and DOE shows no intention of exploiting those differences for the purpose of affecting any duties it has under NWPA.
 
 
 17
 Along the same lines, NRDC complains that closely parsing the language describing high-level waste requirements[4] can lead to a conclusion that DOE will, or might, simply dub high-level waste as something else, and then actually dispose of it improperly. Perhaps DOE could do that, but it denies any intention of so doing, and the Manual does not require that interpretation. In fact, DOE assures us that what it does do will be documented and will be publicly available. It does not plan a camisado. Moreover, the Manual expressly states that disposal of high-level waste "must be in accordance with the provisions of the Atomic Energy Act of 1954, as amended, the Nuclear Waste Policy Act of 1982, as amended, or any other applicable statutes." See DOE M 435.1-1, Ch. II, § S. NRDC argues that because statutes other than NWPA are referred to in this obey-the-law statement, DOE might violate NWPA in favor of following a different statute when it is not permitted so to do. Assuming that NWPA would even apply to those decisions, that is not a plain reading of the provision. Again, this looks like a wait-for-developments situation.
 
 
 18
 That is, rather than plunging into a highly technical area of chemistry and physics, and dealing with the almost insurmountable problem of how to handle nuclear waste in the abstract, the notion of "fit" counsels patience. In that regard, it is not amiss to note that when the highly expert NRC was asked to engage in rule making in the nuclear waste classification area, it eschewed the project with the reflection that "the principles for waste classification are well established and can be applied on a case-by-case basis without revision to the regulations." Denial of Petition for Rule Making, 58 Fed.Reg. 12342, 12342 (Nuclear Regulatory Comm'n March 4, 1993). At one point in its discussion NRC noted: "If the Commission were to establish rules to apply to the wastes ... our inquiry would have to be greatly broadened; and it might become necessary to consider a wide range of situations that might or might not ever come to pass in the future." Id. at 12345. There is much wisdom in that, and we shall follow it.
 
 
 19
 The other element for consideration is hardship, but that does not mean just anything that makes life harder; it means hardship of a legal kind, or something that imposes a significant practical harm upon the plaintiff. See Ohio Forestry, 523 U.S. at 733, 118 S.Ct. at 1670. The Order does not "grant, withhold, or modify any formal legal license, power, or authority"; nor does it "subject anyone to any civil or criminal liability"; nor does it create "legal rights or obligations." Id. And it does not force NRDC to modify its behavior "to avoid future adverse consequences." Id. at 734, 118 S.Ct. at 1671. If the Order raises some uncertainties about what DOE might do in the future, that, too, does not constitute cognizable hardship. See Nat'l Park Hospitality, 538 U.S. at 811, 123 S.Ct. at 2032.
 
 
 20
 Moreover, the fact that NRDC might think that it is cheaper and easier to attack the order in gross, rather than awaiting some truly concrete action, is not sufficient to show true hardship. As the Supreme Court has said:
 
 
 21
 [I]n any event, the Court has not considered this kind of litigation cost saving sufficient by itself to justify review in a case that would otherwise by unripe. The ripeness doctrine reflects a judgment that the disadvantages of a premature review that may prove too abstract or unnecessary ordinarily outweigh the additional costs of—even repetitive— postimplementation litigation.
 
 
 22
 Ohio Forestry, 523 U.S. at 735, 118 S.Ct. at 1671.
 
 
 23
 In sum, we are not satisfied that delayed review will cause any real cognizable hardship. Specifically, we see no realistic, as opposed to chimeric, danger that NRDC will sustain an injury if we await developments. See Chang, 327 F.3d at 921. However, we do think that intervention at this point would unduly interfere with the administrative process and that the courts would benefit greatly from a reification of the issues through further factual development. The case is, in a word, "unripe."
 
 CONCLUSION
 
 24
 The management, storage and permanent disposal of nuclear waste, especially high-level waste, is one of the gravest public safety and environmental problems facing our society. It is also the quintessential political "hot" potato. While we, as a society, want to keep reaping benefits from nuclear science and the use of nuclear materials, nobody wants the resulting waste stored or disposed of anywhere close to himself.
 
 
 25
 When it enacted NWPA, Congress thought it had hit on a solution; it thought that a method for finding the final resting place had been discovered. Over twenty years later, we continue to stagger on in our quest for that perfect repository, and we have not reached our goal. But, then, perhaps twenty years is not that long a period when we realize that we seek a place to store high-level waste safely for hundreds of thousands of years,[5] and what historians have been pleased to call the dawn of civilization was less than ten thousand years ago. At any rate, as our society slowly gropes its way towards some sort of answer, it also continues to generate the waste at a substantial rate. In fact, DOE projects that by midcentury the amount of high-level waste will exceed the storage capacity of the only site that is even dimly in sight—Yucca Mountain, Nevada. In the meantime, our society must deal with its radioactive refuse.
 
 
 26
 DOE has the duty of managing that portion of the waste that has been generated by atomic energy defense activities. In Order 435.1, it has devised a way to do that; a method that NRDC claims is subject to and will violate NWPA. NRDC wants us to leap into the fray immediately. But it is too early for that. We must adopt a wait-and-see attitude rather than making assumptions about the future and about the bona fides and talents of DOE. That approach allocates initial authority and responsibility where it belongs—the place Congress put it. It also helps to assure that the ultimate decision of the courts will not be truly ignorant and, perhaps, toxic. There might be some danger in waiting, but that is not a greater hardship for NRDC and the rest of our society than the one already imposed by our high-level-waste Frankenstein.
 
 
 27
 Despite NRDC's anxiety, the courts must await the coming of a proper time for decision, if, in the long run, that time ever comes. Maybe it never will come because DOE will not take actions that require—or even seem to require—court intervention. Who knows? In fine, the issue is not yet ripe.
 
 
 28
 Therefore, we vacate the district court's judgment and remand with a direction to dismiss this action.
 
 
 29
 REVERSED and REMANDED.
 
 
 
 Notes:
 
 
 [1]
 For ease of reading and to obviate the need for an extraordinarily long indentation, the next five paragraphs are in text form although they are all quoted
 
 
 [2]
 42 U.S.C. § 10101(12) reads:
 The term "high-level radioactive waste" means—(A) the highly radioactive material resulting from the reprocessing of spent nuclear fuel, including liquid waste produced directly in reprocessing and any solid material derived from such liquid waste that contains fission products in sufficient concentrations; and (B) other highly radioactive material that the Commission, consistent with existing law, determines by rule requires permanent isolation.
 
 
 [3]
 DOE M 435.1-1, Ch. II, § A reads:
 High-level waste is the highly radioactive waste material resulting from the reprocessing of spent nuclear fuel, including liquid waste produced directly in reprocessing and any solid material derived from such liquid waste that contains fission products in sufficient concentrations; and other highly radioactive material that is determined, consistent with existing law, to require permanent isolation.
 The differences between this and § 10101(12) are underlined.
 
 
 [4]
 See DOE M 435.1-1, Ch. II, §§ A-C.
 
 
 [5]
 Nuclear Energy Inst., Inc. v. EPA, 373 F.3d 1251, 1258, 1298-99 (D.C.Cir.2004).