Justice Sotomayor,
with whom Justice Breyer joins as to Part I, concurring in part and concurring in the judgment.
As this case illustrates, the proper application of Baker’s six factors has generated substantial confusion in the lower courts. I concur in the Court’s conclusion that this case does not present a political question. I write separately, however, because I understand the inquiry required by the political question doctrine to be more demanding than that suggested by the Court.
I
The political question doctrine speaks to an amalgam of circumstances in which courts properly examine whether a particular suit is justiciable — that is, whether the dispute is appropriate for resolution by courts. The doctrine is “essentially a function of the separation of powers,” Baker v. Carr, 369 U. S. 186, 217 (1962), which recognizes the limits that Article III imposes upon courts and accords appropriate respect to the other branches’ exercise of their own constitutional powers.
In Baker, this Court identified six circumstances in which an issue might present a political question: (1) “a textually demonstrable constitutional commitment of the issue to a coordinate political department”; (2) “a lack of judicially discoverable and manageable standards for resolving it”; (3) “the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion”;' (4) “the impossibility of a court’s undertaking independent *203 resolution without expressing lack of the respect due coordinate branches of government”; (5) “an unusual need for unquestioning adherence to a political decision already made”; or (6) “the potentiality of embarrassment from multifarious pronouncements by various departments on one question.” Ibid. Baker established that “[u]nless one of these formulations is inextricable from the ease at bar, there should be no dismissal for nonjusticiability.” Ibid. But Baker left unanswered when the presence of one or more factors warrants dismissal, as well as the interrelationship of the six factors and the relative importance of each in determining whether a case is suitable for adjudication.
In my view, the Baker factors reflect three distinct justifications for withholding judgment on the merits of a dispute. When a case would require a court to decide an issue whose resolution is textually committed to a coordinate political department, as envisioned by Baker’s first factor, abstention is warranted because the court lacks authority to resolve that issue. See, e. g., Nixon v. United States, 506 U. S. 224, 229 (1993) (holding nonjusticiable the Senate’s impeachment procedures in light of Article I’s commitment to the Senate of the “ ‘sole Power to try all Impeachments’ ”); see also Marbury v. Madison, 1 Cranch 137, 165-166 (1803) (“By the constitution of the United States, the president is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character and to his own conscience”). In such cases, the Constitution itself requires that another branch resolve the question presented.
The second and third Baker factors reflect circumstances in which a dispute calls for decisionmaking beyond courts’ competence. “ ‘The judicial Power’ created by Article III, § 1, of the Constitution is not whatever judges choose to do,” but rather the power “to act in the manner traditional for English and American courts.” Vieth v. Jubelirer, 541 U. S. 267, 278 (2004) (plurality opinion). That traditional role in *204 volves the application of some manageable and cognizable standard within the competence of the Judiciary to ascertain and employ to the facts of a concrete case. When a court is given no standard by which to adjudicate a dispute, or cannot resolve a dispute in the absence of a yet-unmade policy determination charged to a political branch, resolution of the suit is beyond the judicial role envisioned by Article III. See, e. g., Gilligan v. Morgan, 413 U. S. 1, 10 (1973) (“[I]t is difficult to conceive of an area of governmental activity in which the courts have less competence” than “[t]he complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force”); Vieth, 541 U. S., at 278 (“One of the most obvious limitations imposed by [Article III] is that judicial action must be governed by standard ... ”). This is not to say, of course, that courts are incapable of interpreting or applying somewhat ambiguous standards using familiar tools of statutory or constitutional interpretation. But where an issue leaves courts truly rudderless, there can' be “no doubt of [the] validity” of a court’s decision to abstain from judgment. Ibid.
The final three Baker factors address circumstances in which prudence may counsel against a court’s resolution of an issue presented. Courts should be particularly cautious before forgoing adjudication of a dispute on the basis that judicial intervention risks “embarrassment from multifarious pronouncements by various departments on one question,” would express a “lack of the respect due coordinate branches of government,” or because there exists an “unusual need for unquestioning adherence to a political decision already made.” 369 U. S., at 217. We have repeatedly rejected the view that these thresholds are met whenever a court is called upon to resolve the constitutionality or propriety of the act of another branch of Government. See, e. g., United States v. Munoz-Flores, 495 U. S. 385, 390-391 (1990); Powell v. McCormack, 395 U. S. 486, 548, 549 (1969). A court may not refuse to adjudicate a dispute merely because a decision *205 “may have significant political overtones” or affect “the conduct of this Nation’s foreign relations,” Japan Whaling Assn. v. American Cetacean Soc., 478 U. S. 221, 230 (1986). Nor may courts decline to resolve a controversy within their traditional competence and proper jurisdiction simply because the question is difficult, the consequences weighty, or the potential real for conflict with the policy preferences of the political branches. The exercise of such authority is among the “gravest and most delicate dut[ies] that this Court is called on to perform,” Blodgett v. Holden, 275 U. S. 142, 148 (1927) (Holmes, J., concurring), but it is the role assigned to courts by the Constitution. “Questions may occur which we would gladly avoid; but we cannot avoid them. All we can do is, to exercise our best judgment, and conscientiously to perform our duty.” Cohens v. Virginia, 6 Wheat. 264, 404 (1821).
Rare occasions implicating Baker’s final factors, however, may present an “ ‘unusual case’ ” unfit for judicial disposition. 369 U. S., at 218 (quoting the argument of Daniel Webster in Luther v. Borden, 7 How. 1, 29. (1849)). Because of the respect due to a. coequal and independent department, for instance, courts properly resist calls to question the good faith with which another branch attests to the authenticity of its internal acts. See, e. g., Marshall Field & Co. v. Clark, 143 U. S. 649, 672-673 (1892) (deeming “forbidden by the respect due to a coordinate branch of the government” “[judicial action” requiring a belief in a “deliberate conspiracy” by the Senate and House of Representatives “to defeat an expression of the popular will”); see also Munoz-Flores, 495 U. S., at 409-410 (Scalia, J., concurring in judgment) (“Mutual regard between the coordinate branches, and the interest of certainty, both demand that official representations regarding . . . matters of internal process be accepted at face value”). Likewise, we have long acknowledged that courts are particularly ill suited to intervening in exigent disputes necessitating unusual need for “attributing finality to the ac *206 tion of the political departments,” Coleman v. Miller, 307 U. S. 433, 454 (1939), or creating acute “risk [of] embarrassment of our government abroad, or grave disturbance at home,” Baker, 369 U. S., at 226. See, e. g., Luther, 7 How., at 43 (“After the President has acted and called out the militia, is a Circuit Court of the United States authorized to inquire whether his decision was right? ... If the judicial power extends so far, the guarantee contained in the Constitution of the United States is a guarantee of anarchy, and not of order”).[1] Finally, it may be appropriate for courts to stay their hand in cases implicating delicate questions concerning the distribution of .political authority between coordinate branches until a dispute is ripe, intractable, and incapable of resolution by the political process. See Goldwater v. Carter, 444 U. S. 996, 997 (1979) (Powell, J., concurring in judgment). Abstention merely reflects that judicial intervention in such cases is “legitimate only in the last resort,” Chicago & Grand Trunk R. Co. v. Wellman, 143 U. S. 339, 345 (1892), and is disfavored relative to the prospect of accommodation between the political branches.
When such unusual cases arise, abstention accommodates considerations inherent in the separation of powers and the limitations envisioned by Article III, which conferred authority to federal courts against a common-law backdrop that recognized the propriety of abstention in exceptional cases. New Orleans Public Service, Inc. v. Council of City of New Orleans, 491 U. S. 350, 359 (1989); see generally Shapiro, Jurisdiction and Discretion, 60 N. Y. U. L. Rev. 543 (1985) *207 (hereinafter Shapiro). The political questions envisioned by Baker’s final categories find common ground, therefore, with many longstanding doctrines under which considerations of justiciability or comity lead courts to abstain from deciding questions whose initial resolution is better suited to another time, see, e. g., National Park Hospitality Assn. v. Department of Interior, 538 U. S. 803, 808 (2003) (ripeness); United States Parole Comm’n v. Geraghty, 445 U. S. 388, 397 (1980) (mootness); or another forum, see, e. g., Gulf Oil Corp. v. Gilbert, 330 U. S. 501, 507 (1947) (forum non conveniens); Railroad Comm’n of Tex. v. Pullman Co., 312 U. S. 496, 498-500 (1941); Louisiana Power & Light Co. v. City of Thibodaux, 360 U. S. 25, 25-30 (1959); Burford v. Sun Oil Co., 319 U. S. 315, 333-334 (1943) (abstention in favor of a state forum); United States v. Western Pacific R. Co., 352 U. S. 59, 63-64 (1956) (primary jurisdiction doctrine). See also, Daimler Chrysler Corp. v. Cuno, 547 U. S. 332, 352 (2006) (“The doctrines of mootness, ripeness, and political question all originate in Article Ill’s ‘ease’ or ‘controversy’ language”); Shapiro 550-557, 580-587 (describing practices of judicial abstention sounding in justiciability, comity, forum non conveniens, and separation of powers).
To be sure, it will be the rare case in which Baker’s final factors alone render a case nonjusticiable.[2] But our long historical tradition recognizes that such exceptional cases arise, and due regard for the separation of powers and the judicial role envisioned by Article III confirms that abstention may be an appropriate response.
*208 1 — 1
The court below held that this case presented a political question because it thought petitioner’s suit asked the court to decide an issue “textually committed” to a coordinate branch — namely, “to review a policy of the State Department implementing, the President’s decision” to keep the United States out of the debate over the status of Jerusalem. 571 F. 3d 1227,1231-1232 (CADC 2009). Largely for the reasons set out by the Court, I agree that the Court of Appeals misapprehended the-nature of its task. In two respects, however, my understanding of the political question doctrine might require a court to engage in further analysis beyond that relied upon by the Court.
First, the Court appropriately recognizes that petitioner’s claim to a statutory right is “relevant” to the justiciability inquiry required in this case. Ante, at 196. In order to evaluate whether a case presents a political question, a court must first identify with precision the issue it is being asked to decide. Here, petitioner’s suit claims that a federal statute provides him with a right to have “Israel” listed as his place of birth on his passport and other related documents. App. 15-18. To decide that question, a court must determine whether the statute is constitutional, and therefore mandates the Secretary of State to issue petitioner’s desired passport, or unconstitutional, in which case his suit is at an end. Resolution of that issue is not one “textually committed” to another branch; to the contrary, it is committed to this one. In no fashion does the question require a court to review the wisdom of the President’s policy toward Jerusalem or any other decision committed to the discretion of a coordinate department. For that reason, I agree that the decision below should be reversed.
That is not to say, however, that no statute could give rise to a political question. It is not impossible to imagine a case involving the application or even the constitutionality of an enactment that would present a nonjusticiable issue. In *209 deed, this Court refused to determine whether an Ohio state constitutional provision offended the Republican Guarantee Clause, Art. IV, §4, holding that “the question of whether that guarantee of the Constitution has been disregarded presents no justiciable controversy.” Ohio ex rel. Davis v. Hildebrant, 241 U. S. 565, 569 (1916). A similar result would follow if Congress passed a statute, for instance, purporting to award financial relief to those improperly “tried” of impeachment offenses. To adjudicate claims under such a statute would require a court to resolve the very same issue we found nonjusticiable in Nixon. Such examples are atypical, but they suffice to show that the foreclosure altogether, of political question analysis in statutory cases is unwarranted.
Second, the Court suggests that this case does not implicate the political question doctrine’s concern with issues exhibiting “ ‘a lack of judicially discoverable and manageable standards,’ ” ante, at 197, because the parties’ arguments rely on textual, structural, and historical evidence of the kind that courts routinely consider. But that was equally true in Nixon, a case in which we found that “the use of the word 'try’ in the first sentence of the Impeachment Trial Clause lacks sufficient precision to afford any judicially manageable standard of review of the Senate’s actions.” 506 U. S., at 230. We reached that conclusion even though the parties’ briefs focused upon the text of the Impeachment Trial Clause, “the Constitution’s drafting history,” “contemporaneous commentary,” “the unbroken practice of the Senate for 150 years,” contemporary dictionary meanings, “Hamilton’s Federalist essays,” and the practice in the House of Lords prior to ratification. Such evidence was no more or less unfamiliar to courts than that on which the parties rely here.
In my view, it is not whether the evidence upon which litigants rely is common to judicial consideration that determines whether a case lacks judicially discoverable and manageable standards. Rather, it is whether that evidence in *210 fact provides a court a basis to adjudicate meaningfully the issue with which it is presented. The answer will almost always be yes, but if the parties’ textual, structural, and historical evidence is inapposite or wholly unilluminating, rendering judicial decision no more than guesswork, a case relying on the ordinary kinds of arguments offered to courts might well still present justiciability concerns.
In this case, however, the Court of Appeals majority found a political question solely on the basis that this case required resolution of an issue “textually committed” to the Executive Branch. Because there was no such textual commitment, I respectfully concur in the Court’s decision to reverse the Court of Appeals.

 See also Martin v. Mott, 12 Wheat. 19, 29-30 (1827) (Story, J.) (declining to review the President’s determination that an “exigency has arisen,” necessitating the “call [of] the militia into actual service,” recognizing need for “[a] prompt and unhesitating obedience to orders is indispensable”); Ware v. Hylton, 3 Dall. 199, 260 (1796) (Iredell, J., concurring) (to declare treaty with Great Britain void would turn on “considerations of policy, considerations of extreme magnitude, [which are] certainly entirely incompetent to the examination and decision of a Court of Justice”).

 Often when such factors are implicated in a case presenting a political question, other factors identified in Baker will likewise be apparent. See, e. g., Nixon v. United States, 506 U. S. 224, 236 (1993) (“[i]n addition to the textual commitment argument,” finding persuasive that “opening the door of judicial review” of impeachment procedures would “ ‘expose the political life of the country to months, or perhaps years, of chaos’ ”); Baker v. Carr, 369 U. S. 186, 222 (1962) (explaining that the Court in Luther v. Borden, 7 How. 1 (1849), found present features associated with each of the three rationales underlying Baker’s factors).