Slip Op.14-6


UNITED STATES COURT OF INTERNATIONAL TRADE

<table>
<tr><td>

ALUMINUM EXTRUSIONS FAIR TRADE
COMMITTEE,

        Plaintiff,

           v.

UNITED STATES,

        Defendant.

</td><td>

Before: Donald C. Pogue,
       Chief Judge

Consol. Court No. 11-00216[1]

</td></tr>
</table>


[Plaintiff's motion for judgment on the agency record denied;
Department of Commerce's determinations affirmed]

Dated:January 23, 2014

    Alan H. Price, Robert E. DeFrancesco, Lori E. Scheetz, Tessa Capeloto, Laura El-Sabaawi, and Derick G. Holt, Wiley Rein, LLP, of Washington, DC for the Aluminum Extrusions Fair Trade Committee.

    Tara K. Hogan, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendant.  Of counsel on the brief was Rebecca Cantu, Attorney, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, Washington, DC.

    Duane W. Layton, Jeffery C. Lowe, and Sydney Mintzer, Mayer Brown, LLP, of Washington, DC for Aavid Thermalloy.

---

[1] This action was consolidated with Court No. 11-00218.

## OPINION

**Pogue, Chief Judge:**  In this action, the Aluminum Extrusions Fair Trade Committee ("AEFTC") challenges two aspects of the Department of Commerce's ("Commerce" or the "Department") definition of the products excluded from Anti-Dumping ("AD") and Countervailing Duty ("CVD") orders on aluminum extrusions from the People's Republic of China ("China").[2]  Plaintiff first argues that the definition of finished heat sinks ("FHS") excluded from the orders does not accurately reflect the definition provided by the International Trade Commission ("ITC" or the "Commission") in its finding of no material injury. Second, Plaintiff challenges the Department's failure to specify in the instructions issued to Customs and Border Protection ("CBP") that importers must certify that their products meet certain testing requirements allegedly required by the ITC's definition of FHS.

The court has jurisdiction over Plaintiff's claims under 28 U.S.C. 1581(c).[3]

---

[2] These orders were issued by the Department acting under Section 702 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1671(a)(2006).  All further citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, 2006 edition.
[3] Jurisdiction was addressed in detail in response to Defendant and Defendant-Intervenor's Motions under USCIT R. 12(b)(1) and
(footnote continued . . .)

Currently before the Court is Plaintiff's motion for judgment on the agency record. ECF No. 49.[4]  The motion is denied.  The Plaintiff has not demonstrated that the scope of the exclusion in the Department's AD and CVD orders is materially different from the exclusion identified by the ITC.  Further, Plaintiff's claim that the corresponding instructions issued by the Department to CBP are flawed in failing to require testing, certification, or proof of buyer in order to establish their eligibility for the FHS exclusion, must be rejected as unripe for decision.  Until CBP, acting upon the Department's instructions, misidentifies products eligible for the ITC's FHS exclusion, the Plaintiff's claim remains speculative and their injury hypothetical.

---

12(b)(5).  See Aluminum Extrusions Fair Trade Committee v. United States, __ CIT __, Slip Op 13-26 (Feb. 27, 2013) (ECF No. 45).

[4] In its motion, Plaintiff asks that the Court void the Department's AD and CVD orders for their alleged failure to properly reflect the scope of the ITC's negative injury and like product findings. Id. at 7. In addition, Plaintiff argues that the Department's instructions to CBP must be revised to require that products allegedly falling within the scope of the ITC's negative injury finding, and therefore not requiring cash deposits, be certified as having undergone thermal testing. Id. at 15.

**BACKGROUND**

In response to the Plaintiff's petitions, Commerce initiated an investigation of aluminum extrusions imported from China in April of 2010.[5] Pl. Mot. for Judgment on the Agency Record, May 15, 2014, ECF No. 49 ("Pl.'s Mot.") at 4.  The final determinations in this investigation concluded that Chinese aluminum extrusions were being sold at less than fair value and that countervailable subsidies were being provided by the Chinese government, thus warranting the imposition of AD and CV duties on the subject imports. Aluminum Extrusions From the People's Republic of China, 76 Fed. Reg. 18,521 (Dep't Commerce Apr. 4, 2011) (final affirmative countervailing duty determination); Aluminum Extrusions From the People's Republic of China, 76 Fed. Reg. 18,524 (Dep't Commerce Apr. 4, 2011) (final determination of sales less than fair value).  The scope of the Department's determination included finished and unfinished aluminum shapes produced by extrusion and identified by their metallurgical content and role in a production process, with clarifying statements and examples about product types

---

[5] Plaintiff has represented the domestic manufacturers of aluminum extrusions in both the administrative investigation of Chinese imports and in this action.

excluded from the investigation.[6] Aluminum Extrusions, 76 Fed.

Reg. at 18,521-22.

Concurrent with the Department's investigation, and in

accordance with 19 U.S.C. 1671(b) and 19 U.S.C. 1673b(a), the

ITC conducted its own investigation to determine whether

domestic industries were materially injured or threatened with

material injury by the importation of dumped or subsidized

aluminum extrusions.  While the ITC's preliminary affirmative

finding of injury matched the product scope definition used by

the Department and reflected the original petition, Certain

Aluminum Extrusions From China, 75 Fed. Reg. 34,482 (ITC June

17, 2010) (preliminary determination), this scope finding was

revised in the Commission's final determination to exclude FHS

_____

[6] Aluminum extrusions as a broad category (as they were defined in the Commerce investigation and in the ITC's preliminary report) are industrial and consumer objects identifiable by their chemical content and manufacturing process.  First, aluminum extrusions consist chemically of one of 160 specified aluminum alloy types that are all "soft alloys" identified by Aluminum Association designations in the 1000, 3000, and 6000 range that mix pure aluminum with magnesium or silicon.  Second, these products have been shaped by an extrusion process – heating a billet of the alloy and pushing it through a precision die that produces a raw shape usually called a "blank" that is then further machined, finished, or coated as required for its future manufacturing or consumer use. See 76 Fed. Reg. 18521, 18524, and 18525 (anti-dumping and countervailing duty Final Determinations) and Certain Aluminum Extrusions from China, Investigation Nos. 701-TA-475 and 731-TA-1177 (Final) at 5-10. The exclusion of FHS from this broader category based on their precision machining and customized thermal characteristics is the context of the present dispute.

as a separate domestic like product and industry not threatened with material injury. Certain Aluminum Extrusions From China, 76 Fed. Reg. 29,007 (ITC May 19, 2011) (final determination). This exclusion was based on a set of criteria regularly used by the ITC and hinged specifically on

> the customized thermal resistance properties of FHS; the unique aspects of the design, testing and production of FHS; differences between FHS and other aluminum extrusions in the channels of trade through which they are sold; evidence that the thermal management industry is perceived by producers and customers as being different from the general aluminum extrusions industry; and the fact that FHS are sold at much higher prices because of high value-added than most other aluminum extrusions.[7]

Certain Aluminum Extrusions from China, USITC Pub.4229, Inv. Nos. 701-TA-475 and 731-TA-1177 (Final), at 9 (May 2011) ("ITC Report").

In defining the excluded industry and domestic like product, the ITC report described FHS, in the introductory Determinations section, as "fabricated heat sinks, sold to electronics manufacturers, the design and production of which are organized around meeting certain specified thermal

---

[7] This exclusion in the final determination is explained in more detail with specific reference to the ITC's six factor test in Certain Aluminum Extrusions from China, Inv. Nos. 701-TA-475 and 731-TA-1177 (Final), USITC Pub. 4229 (May 2011) ("ITC Report"). The ITC's negative injury determination was challenged before the U.S.C.I.T. and upheld in Aluminum Extrusions Fair Trade Comm. V. United States, 34 Int'l Trade Rep. (BNA) 2119.

performance requirements and which have been fully, albeit not necessarily individually, tested to comply with such requirements." Id. at 1 n. 4; Id. at 3 n. 1.  In response to the exclusion specified in the ITC's final report, the Department revised its own final determination to exclude FHS and issued AD and CVD orders excluding FHS from the scope of the cash deposit requirements on aluminum extrusions. Pl.'s Mot. at 5; Draft Customs Instructions, AD. PR. Doc. No. 540.

In identifying the excluded products in the AD and CVD orders, the Department modified the exact language used by the ITC in its footnote 4.  Specifically, the Department eliminated the four words "sold to electronics manufacturers" from the ITC's product description. Pl.'s Mot. at 5.  This clause, identifying the buyers of FHS, is alleged by the Plaintiff to represent a critical limitation on the scope of the ITC's exclusion from the injury determination.[8] Id. at 5-6.  To the

---

[8] Plaintiff argues that by eliminating this clause and failing to specify a testing requirement reflective of the clause (retained in the AD and CVD orders) describing thermal testing as part of the definition of FHS, the Department has expanded the definition of FHS to include the broader category of fabricated heat sinks, which may not have been fully tested to insure that they comply with specific thermal requirements. Reply Brief of the Aluminum Extrusions Fair Trade Committee, Sept. 9, 2013, EFC No. 59 ("Pl.'s Reply Br.") at 4.  To the Plaintiff, FHS are understood as a subcategory of fabricated heat sinks distinguishable from the parent category by thermal testing and identity of the purchaser. Pl.'s Mot. at 11.

Plaintiff, the elimination of these four words expands the scope of the ITC's excluded category and therefore represents both an unlawful violation of the Department's authority relative to the ITC and an inappropriate limit on the remedy to which the law entitles a domestic industry injured by subsidized imports. Compl., ECF No. 7, at 6; Pl.'s Reply Br. at 5.

## STANDARD OF REVIEW

The Department's determination will be affirmed unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 477 (1951) (quoting Consol. Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)).  Accordingly, when reviewing agency determinations, findings, or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole. Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350-51 (Fed. Cir. 2006). In doing so, the court must consider any fact that "fairly detracts from [the agency conclusion's] weight." Universal Camera Corp., 340 U.S. at 488.  As importantly, a reviewing

court may not "displace the [agency's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." Id.

**DISCUSSION**

I.  The Department's Exclusion of "sold to electronics manufacturers" in the AD and CVD Orders

Plaintiff has not provided sufficient evidence to support the claim that the Department's implementation of the ITC's separate domestic like product and negative injury finding expands the ITC's definition.  As explained below, the evidence on the record can reasonably be read to support the Department's view that that the elimination of the clause "sold to electronics manufacturers" from the description of FHS in the AD and CVD orders will not result in any material difference in how CBP classifies imported aluminum extrusions and implements the cash deposit order.  Absent evidence that the Department's altered wording will prevent the ITC's negative injury finding from being correctly implemented, we defer to the Department's judgment in implementing its AD and CVD orders.

AEFTC argues that the Department's decision to alter the wording of the ITC's definition of FHS represents an unlawful expansion of the Department's authority relative to the ITC, improperly substituting its judgment for that of the Commission. Pl.'s Mot. at 12.[9] Specifically, Plaintiff alleges that the identity of the purchaser is a critical part of the definition of FHS as found by the ITC; eliminating this clause from the definition therefore necessarily broadens the category of the exclusion and violates the intent of the ITC. Id. at 11. If this is correct, then the Department has overstepped its statutory authority, because the statute does not give Commerce the discretion to materially modify the findings of the ITC and requires that it impose anti-dumping or countervailing duties on merchandise that has been found to be both unfairly subsidized by Commerce and harmful or prospectively harmful to a domestic industry by the ITC. 19 U.S.C. §§ 1671(a) and 1673.

But the legal validity of Plaintiff's claim is critically dependent upon the factual question of whether the Department's

---

[9] The distinct and mutually dependent roles played by the Commission and the Department in implementing AD and CVD duties arise from 19 U.S.C. § 1671a (describing the process for countervailing duties) and 19 U.S.C. §1673(2) (describing the parallel process for antidumping duties). The interlocking functions of the Commission and the Department in practice are described in Mitsubishi Electric Corp. v. United States, 898 Fed. 2d. 1577, 1579 (Fed. Cir. 1990).

omission of the words "sold to electronics manufacturers" actually has "effectively removed a subset of heat sinks, which the Commission found to be materially injuring the domestic industry . . . from the scope of the AD/CVD order." Pl.'s Mot. at 11. It is in establishing this factual claim that Plaintiff's argument fails.

AEFTC bases its argument on the assertion that the ITC's definition of FHS consists only of the brief description given in footnote 4 of the Final Injury Determination and that every element of the text of this footnote must be faithfully and exactly repeated by the Department.[10] By omitting the clause describing purchasers, the Department is alleged to have produced AD and CVD orders so vague as to "effectively expand the Commission's definition of 'finished heat sink,' thereby unlawfully denying relief to a segment of the U.S. industry that the Commission found to be materially injured." Id. at 12-13.

Two aspects of the record indicate that the exclusion of these four words does not alter the definition of FHS. First, the submissions made by the parties do not indicate that any products will be improperly excluded from the AD and CVD orders as a result of the omitted language. Second, the ITC report

---

[10] For the exact text of this footnote, which appears both in Sections entitled "Determinations" and "Views of the Commission," see above pp. 6-7.

itself, examined in detail, does not support the proposition that the four words omitted by the Department actually are critical to the product and industry definitions developed by the Commission.

Beyond the assertion cited above that Commerce has improperly expanded the scope of the ITC's exclusion, Plaintiff does not identify anywhere in the record the products that would be improperly admitted without appropriate AD or CVD duties if the purchaser is not specified in the AD and CVD orders. If there exists a category of FHS possessing all of the physical properties described by the ITC and reflected in the Department's AD and CVD instructions that is not sold to electronics manufacturers or to suppliers of such manufacturers, such products are not identified in the Plaintiff's submissions. This failure is critical, since it leaves no reason to believe, based on the record evidence, that the identity of the purchaser is material to the definition.

Rather, replying to the Defendant's denial that the exclusion has been enlarged by the altered wording, the AEFTC merely repeats the claim that "Commerce improperly expanded the Commission's definition of 'finished heat sinks,' thereby inappropriately excluding merchandise . . . and inappropriately limiting the remedy to the materially injured domestic

industry." Pl.'s Reply Br. at 5.  The only allegation of how the product category might actually be expanded in the reply brief refers to fabricated heat sinks and heat sink blanks that might be improperly classified as FHS and therefore excluded from the AD and CVD orders based on the omitted language.[11] Id. at 7. Implicitly, Plaintiff suggests that these two categories of aluminum extrusions might be distinguishable from FHS only by the identity of their purchasers and therefore would be improperly classified if the final purchaser is not identified in the AD and CVD orders.

Confronting Plaintiff's suggestion, the Department's response is only mildly persuasive.  The Department claims that the omission of the words "sold to electronics manufacturers" represents a clarification of the ITC's definition that does not materially alter the scope of the exclusion. Response in Opposition to Motion for Judgment on the Agency Record, Aug. 30, 2013, ECF No. 58 ("Def. Resp.") at 14.  The Department also argues that this clarification is reasonable and consistent with

---

[11] Fabricated heat sinks are a broader category of aluminum extrusions that are designed around thermal properties but lack the precise surface tolerances and customized thermal resistance properties of FHS. See ITC Report at 7.  Heat sink blanks are a precursor product to fabricated or finished heat sinks that require additional machining, forming, and testing. Id. at 31 (Dissenting Views of Vice Chairman Irving A. Williamson and Comm'r Charlotte R. Lane).

the established practice because CBP, in implementing AD and CVD

orders, is often unable to identify the domestic purchaser.

This has caused the Department to develop a general policy of

not making product identification dependent on end use or the

identity of purchasers.[12] Id. at 13 (citing Circular Welded

Carbon Quality Steel Pipe from the People's Republic of China,

73 Fed. Reg. 31,970 (Dep't of Commerce June 5, 2008) (final

determination) and accompanying I&D Memo at cmt. 1). Commerce

argues further that including the omitted language might "reduce

the effectiveness of the exclusion by creating ambiguity" by

---

[12] While the Department's general policy is clear, Defendant's reliance on King Supply Co. LLC v. United States, 674 F. 3d 1343 (Fed. Cir. 2012), to support the argument that "sold to electronics manufacturers" should be understood as exemplary rather than limiting language due to the absence of express terms such as "only" or "solely" is misplaced. At issue in King Supply was the Department's interpretation of the language of its own AD orders rather than a potential conflict between the ITC's product or industry definitions and those of the Department. It would be unwarranted to take the ruling in King Supply as suggesting that the Department may interpret the scope language in an ITC determination as exemplary absent specific limiting terms. Similarly, the citation of Polites v. United States, __ CIT __, 780 F. Supp. 2d 1351, 1356 (2011), by the Defendant-Intervenor to support the claim that the Department has broad authority over the language of AD and CVD orders is not relevant, since the present case does not deal with the Department's latitude to formulate the text of such orders, but rather their obligation to faithfully implement the findings of the ITC, as Plaintiff correctly points out. Pl.'s Mot. at 11; Response of Aavid Thermalloy, LLC in Opposition to Mot. for Judgment on the Admin. Record, Aug. 30, 2013, ECF No. 57 (Def.-Intervenor's Resp.") at 6.

directing CBP to consider factors that it is unable to properly evaluate. Id. at 14.

Nevertheless, the Department's claim is supported by a detailed examination of the way in which the ITC Report defines FHS and the actual significance of the purchaser in this definition. The Commission's finding that there exists a category of aluminum extrusions that it calls finished heat sinks and that no domestic industry is threatened by the import of this product is based on a six-part like product analysis.[13] These six factors include the physical characteristics and uses of the product, its interchangeability with related products, the channels of distribution through which the product moves,[14]

_____

[13] The ITC's product and industry definitions require the Commission to weigh a range of factors based on technically complex and often ambiguous data. The Commission makes a factual determination in defining domestic like products and establishing the boundaries of domestic industries for the purposes of its injury determinations. In this determination, the Commission uses different tests and does not rely on any single factor or product characteristic to define a product type. ITC Report at 3-4. In this case, the ITC employed a six factor test that the report describes as a "traditional" ITC approach to like product definition. See id. at 7, n. 16. For a review of the six factor test and a discussion of like product analysis, see Cleo Inc. v United States, 501 F. 3d 1291, 1295 (Fed. Cir. 2007).

[14] This factor includes the identity of the purchaser or end user; in the instant investigation, the Commission observes that FHS are sold to specialized distributors as well as manufacturers of electronic products. ITC Report at 8.

common manufacturing facilities, processes, or employees, and customer or consumer perceptions of the product. See ITC Report at 7-9.[15]

Examining the ITC Report as a whole, four facts emerge that support the Department's characterization of "sold to electronics manufacturers" as "descriptive language that does not limit the exclusion in any way." Def. Resp. at 14. First, FHS are repeatedly identified in the ITC Report by two physical properties – (1) their precise design and finish characteristics and (2) their thermal resistance properties that are intended to meet the specific needs of a given piece of electronic equipment. See, e.g., ITC Report at 7. This suggests that the ITC itself relies primarily on physical properties to define FHS, making it reasonable for the Department to interpret the omitted "sold to electronics manufacturers" as redundantly descriptive rather than limiting language.

---

[15] In this case, both the ITC's decision to define FHS as a separate product and the methodology by which the Commission distinguished FHS from all other aluminum extrusions were contested by dissenting members of the Commission. See Id. at 31-35 (Dissenting Views of Vice Chairman Irving A. Williamson and Comm'r Charlotte R. Lane). The methodology used in the like product analysis was itself challenged in Aluminum Extrusions Fair Trade Comm. v. United States, Slip Op. 2012-129, 2012 Ct. Intl. Trade Lexis 134, (CIT Oct. 11, 2012). While this fact makes the Commission's findings no less binding or necessarily more ambiguous, it does highlight the complexity of ITC findings and the difficulty of reducing them to a simple incantation.

Second, FHS are sold to both manufacturers and
distributors. Id. at 8. This fact also suggests that the words
omitted by Commerce are intended to clarify the function and
specific design parameters of FHS and not to impose a
restriction based on the purchaser. Since the ITC acknowledges
that manufacturers and distributors purchase FHS, the purpose of
specifying "sold to electronics manufacturers" is more likely to
be clarification of the actual end use of FHS - cooling
electronic equipment - than establishing an exclusion based on
the identity of the purchaser that would also create an
inconsistency within the ITC Report.

Third, FHS are "precisely or optimally suited to cool the
specific electronic devices for which they have been designed."
Id. at 7. This design specificity supports the point made by
the Defendant-Intervenors that FHS, as identified by their
physical characteristics, have no significant use or plausible
purchaser outside of electronics manufacture.[16] Def.-Intervenor's

---

[16] The design specificity of FHS and the fact that electronics
manufacture makes up the only end use for FHS is also supported
by the demand analysis conducted by the ITC. See ITC Report at
25. The Commission also notes that the value added from
specifically designed thermal resistance accounts for a large
gap in prices between FHS and all other aluminum extrusions. Id.
at 9. The reasons for this difference in price, which affects
both the "price" and "customer and producer perceptions" prongs
of the Commission's six factor test, further supports the
characterization of FHS by the Defendant as a product that can
(footnote continued . . .)

Resp. at 5. The Department's omission of the purchaser from the AD and CVD order will therefore not materially change the scope of the orders because the set of FHS sold to end users aside from electronics manufacturers is empty.[17] This further undermines the Plaintiff's claim that the Department's alteration of the Commission's language will prevent the intent of the ITC's findings from being carried out, unlawfully expand the scope of the exclusion defined by the ITC, or allow any aluminum extrusions to improperly enter the country under the FHS exclusion.

Considered as a whole, the ITC's findings are more nuanced than the summary language that appears in, e.g., the ITC Report at 1 n. 4.[18] The report as a whole provides a sufficiently specific definition of the product itself, regardless of the purchaser's identity. Accordingly, based on the record here, the Department's omission of "sold to electronics manufacturers" from the text of the AD and CVD orders is a reasonable way to

---

be correctly and faithfully identified without reference to the specific purchaser.

[17] For clarity, note the distinction here between the immediate purchaser, a group that might include distributors or other market intermediaries as well as manufacturers, and end users, which from the record evidence will consist only of electronics manufacturers.

[18] See above pp. 6-7 for the pertinent language.

implement the scope of the FHS exclusion such that it is both faithful to the ITC's scope definition and possible for CBP to implement.


II. The Department's Failure to Include a Testing Requirement in their Instructions to CBP

Plaintiff also challenges the Department's failure to require, in the instructions issued to CBP, certification of thermal testing for FHS excluded from the orders. The language of both the ITC's FHS exclusion and the Department's own AD and CVD orders specifies that FHS are designed around specific thermal properties and that they have been "fully, albeit not individually, tested to comply with such requirements." ITC Report at 1 n. 4 and 3 n. 1. Plaintiff argues that the failure to specify a testing or certification of testing requirement will necessarily have the effect of unlawfully allowing untested - and therefore unfinished under the ITC's definition - heat sinks to enter the United States under the FHS exclusion. Pl.'s Mot. at 15. Specifically, Plaintiff asserts that since it is impossible for CBP to identify the precise thermal characteristics or tested status of heat sinks by physical examination of the item itself, instructions that do not specify a testing or certification requirement are inherently

unreasonable, necessarily fail to properly reflect the narrow scope of the ITC's FHS exclusion, and must therefore be found unlawful and remanded to the Department for reconsideration. Id. at 15, 16.[19]

While this argument raises reasonable concerns about the implementation of the Department's AD and CVD orders, it must be dismissed as unripe for adjudication. The ripeness prerequisite springs from the Constitution's requirement that the judiciary address only an actual case or controversy and avoid extending its role to advisory or hypothetical judgments. See Nat'l Park Hospitality Ass'n v. Dep't of Interior, 538 U.S. 803, 807-08 (2003). Within the realm of administrative law, ripeness is intended to "prevent the courts, through the avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative

---

[19]Plaintiff draws a plausible parallel between the kind of certification it contends that the Department should require for FHS and the Commission's prior imposition of a requirement that importers produce a statement of the carbon and metallic elements composition of certain iron or steel products. Pl.'s Mot. at 15-16, citing 19 C.F.R. § 141.89 (entry on iron or steel classifiable in Chapter 72 or headings 7301 to 7307, HTSUS (T.D.53092,55977)). Plaintiff suggests that the requirement that such a statement be in the form of a mill test certificate demonstrates both that the Department is willing to impose testing or certification requirements on certain products when necessary and that such a requirement can be implemented by CBP.

decision has been formalized and its effects felt in a concrete way by the challenging parties." Abbott Labs. v. Gardener, 387 U.S. 136, 148-9 (1967), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99 (1977).  Specifically, a claim is not ripe if it is based on "contingent future events that may not occur as anticipated, or indeed may not occur at all." Thomas v. Union Carbide Agricultural Products Co., 473 U.S. 568, 580-81 (quoting 13A Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice and Procedure § 3532 (1984)).

Adjudicating the claim brought by the AEFTC regarding the failure to impose a testing or certification requirement in the CBP instructions carries precisely this danger.[20]  The CBP instructions have not yet been acted upon, and it is not yet possible to evaluate whether the instructions as presently written will result in the unlawful admission of aluminum heat sinks that are not entitled to the Commission's FHS exclusion. The points raised by the Plaintiff, while plausible, remain at this stage hypothetical.  Adjudication of the issue would

_____

[20] All Federal Courts, obliged to follow Constitutional restrictions on their actions, properly consider ripeness questions even when not raised or contested by the parties. Reno v. Catholic Soc. Servs., 509 U.S. 43, 56 n. 18 (1993); Blanchette v. Connecticut Gen. Ins. Corporations, 419 U.S. 102, 138 (1974).

necessarily be speculative and ungrounded in the record evidence that would stem from the agency's consideration.

Courts may, under some circumstances, evaluate and rule on challenges to administrative decisions before their implementation. A claim may be deemed ripe despite its prospective nature if two conditions are met: (1) The plaintiff must demonstrate that they will suffer some serious hardship if judicial review is withheld and the administrative policy is implemented. Abbott Labs, 387 U.S. at 149. (2) Both the record and the issues must be fit for judicial review. To evaluate this second condition, we must determine, inter alia, whether the court "would benefit from the further factual development of the issues presented." Ohio Forestry Ass'n v. Sierra Club, 523 U.S. 726, 733 (1998).

Neither of these conditions for pre-enforcement judgment are present in the instant case. Plaintiff has not alleged any particular and serious hardship that it would actually suffer as a result of the failure to impose a testing or certification requirement on FHS imports. Plaintiff in this case, unlike the drug manufacturers seeking review in Abbott Labs, is neither faced with the prospect of certain and direct harm if the contested determination is enforced, nor an uncertain future

path to judicial review.[21]  Rather, Plaintiff faces only a speculative harm for which, were it to occur, the path for review is clear under Section 702 of the Administrative Procedure Act and 28 U.S.C. 1581(i)4.[22]

In addition, the further development of the factual record would allow the court to evaluate the effectiveness of CBP and of the Department's instructions in implementing the Commission's scope findings by examining specific failures or problems.  After some period of enforcement, any problems CBP might have in properly implementing the scope of the Commissions FHS exclusion will be more concrete and apparent.  This will allow for a more informed evaluation based on a more complete factual record, better reflecting both the practical strengths and Constitutional mandate of the judiciary.

---

[21] The Court in Abbott Labs was careful to distinguish the exceptional, multifaceted, and nearly certain prospective harms faced by plaintiff drug manufacturers from the mere "damage or loss of income" that was found inadequate to sustain prospective review for steel producers challenging the Public Contracts Act in Perkins v. Lukens Steel Co., 310 U.S. 113, 125. Abbott Labs, 387 U.S. at 153.

[22] See Shinyei Corp. of Am. v. United States, 355 F.3d 1297, 1306 (Fed. Cir. 2004) (finding CIT jurisdiction under §1581(i)4 "if Commerce instructions [to CBP] are inaccurate or incorrect").

**CONCLUSION**

For the foregoing reasons, the definition contained in the Department's AD and CVD orders is AFFIRMED and the challenge to the Department's CBP instructions is DISMISSED.[23] Judgment will be entered accordingly.

It is so ORDERED.


_____/s/ Donald C. Pogue_____
Donald C. Pogue, Chief Judge


Dated: January 23, 2014
New York, NY

---

[23] The Plaintiff's additional claim regarding the failure of the Department to initiate an investigation of currency subsidies, having not been addressed in its opening brief as required by USCIT R. 52.2(c), is also deemed abandoned and is therefore DISMISSED.